C. A. S. ENGINEERING CO. *v.* H. J. WALKER CO.

1. PRINCIPAL AND AGENT—COMMISSIONS—SALES AGENCY — CONTRACTS.

   A contract whereby defendant gave to plaintiff "the exclusive selling privileges," in certain territory, of automobile parts manufactured by it, *held*, to be unambiguous, and to entitle plaintiff, in an action therefor, to commissions on all parts sold, including those sold by defendant.

2. APPEAL AND ERROR—REMARKS BY JUDGE—INSTRUCTIONS.

   Where the testimony by accountants had been in conflict, a statement by the trial judge that bookkeepers do not agree, and maybe it is that fact that has given

rise to the statement that bookkeeping sometimes is an art rather than an exact science of mathematics, *held*, not reversible error, where there is nothing in the record to show that it was harmful.

3. PRINCIPAL AND AGENT—DAMAGES—QUESTION FOR JURY.
Evidence as to whether plaintiff was entitled to recover for any expense incurred by it on account of a certain type of motor to be manufactured by defendant, *held*, to present a question of fact for the jury.

4. SAME—FRAUD—EVIDENCE—QUESTION FOR JURY.
Where there was evidence that plaintiff was induced to consent to two per cent. commission instead of five on the sale of certain parts, under the representation by defendant that its profit thereon would be less than 15 per cent., whereas its profit was actually much more than that, the question of fraud was properly one for the jury.

5. APPEAL AND ERROR—FRAUD—INSTRUCTIONS.
The charge of the court on the question of fraud, *held*, not open to objection by defendant.

Error to Wayne; Mandell (Henry A.), J. Submitted June 8, 1921. (Docket No. 31.) Decided October 3, 1921.

Assumpsit by the C. A. S. Engineering Company against the H. J. Walker Company for commissions on the sales of certain goods. Judgment for plaintiff. Defendant brings error. Affirmed.

*Lodge & Brown* (*Isadore Grossman*, of counsel), for appellant.

*Clark, Emmons, Bryant, Klein & Brown*, for appellee.

MOORE, J. Plaintiff was engaged in the business of soliciting orders for automobile parts. Defendant is an Ohio corporation with office and factory in Cleveland, and was engaged in the machining and manufacturing of automobile parts. This litigation arises

out of a contract entered into between the parties on the 13th day of July, 1917. A large amount of business was done under this contract. Controversies arose between the parties, resulting in this litigation. A verdict and judgment were entered in favor of the plaintiff in the sum of $52,371.91. The plaintiff concedes there was improperly included in the verdict an item of $1,035.13, and voluntarily remits that amount, leaving the judgment to remain at the sum of $51,336.78. Upon the oral argument counsel for appellant admitted plaintiff ought to have a judgment for $15,000 to $30,000, but a brief filed subsequently modifies that concession and now fixes the amount at the sum of $11,870.23, besides interest.

The essential portions of the contract which are involved read:

"Detroit, Michigan, July 13, 1917.
"Memorandum of agreement, made by and between the H. J. Walker Company, an Ohio corporation, with headquarters at Cleveland, Ohio, hereinafter known as the party of the first part; and the C. A. S. Sales Company, a corporation organized and existing by virtue of the laws of the State of Michigan, with headquarters at Detroit and Jackson, Michigan, hereinafter known as the party of the second part, to-wit:

"Whereas, the party of the first part is desirous of making such arrangements as may be necessary to successfully handle the selling of its product and machine work throughout the United States of America; and the party of the second part, being desirous of obtaining such parts for sale throughout the United States of America, as manufactured by party of the first part. Now, therefore the parties have agreed as follows:

"1. The party of the first part does hereby grant the party of the second part the 'exclusive selling privileges of all parts manufactured or machined by party of the first part in the United States of America during the life of this contract, with the exception of any parts that the party of the first part may manufacture and sell to, or any parts that the party of the

first part may machine for Chandler Motor Company, of Cleveland, Ohio.

"2. It is agreed by and between both parties to this contract that on all basic prices for machine work or parts which the party of the first part may quote on, that they will add a commission of five (5) per cent. on the gross amount of each sale made by party of the second part for party of the first part in the United States of America, with the exception as noted in paragraph 1, such commission to be paid only on such orders as shall have been accepted and approved, and actually shipped by party of the first part and paid for by the purchaser. * * *

"It is further understood that should it become necessary at any time to quote a lower figure than the basic price originally given by party of the first part on any articles manufactured or machined by them, then and in that event, both parties shall share equally in such reduction of price, that party of the second part accepting less than five per cent. in order to obtain a desirable contract. However, in no case will the party of the first part ask party of the second part to accept less than two per cent.

"4. Party of the second part agrees to obtain contracts for the sale of articles manufactured by party of the first part in the United States of America, to individuals, firms or corporations, or who shall have been approved as to credit by party of the first part, a total of not less than $2,000,000 between the date of the contract herewith, and one year from such date. * * *

"6. Party of the second part does hereby agree that they will not make any contract or sign any agreement with any individual, firm or corporation on behalf of the party of the first part, unless authorized in writing by party of the first part so to do.

"7. Party of the second part does hereby agree to devote a sufficient amount of time to properly and successfully place the articles manufactured or machined by party of the first part before prospective purchasers in the territory allotted to party of the second part.

"8. Party of the first part does hereby agree to refer all correspondence and inquiries for articles or machine work as manufactured by party of the first

part from territory allotted to party of the second part.

"9. All commissions that shall have been earned by party of the second part hereunder, in accordance with the terms of this contract, shall become due and payable ten days after collection by party of the first part, on all sales made by party of the second part.   *   *   *

"11. It is further agreed and understood by and between both parties to this contract that the expense of producing what will be known as Type A truck motor, jigs, dies and tools, shall be borne equally by both parties to this contract.   *   *   *

"It is further understood and agreed by and between both parties hereto, that at all times party of the second part shall have the right and privilege to ask co-operation and engineering service from the party of the first part for the production of samples on various matters where necessary in order to obtain sales for material manufactured by party of the first part."

We quote from the brief of appellant's counsel as follows:

"(1) The court erred in charging the jury that plaintiff was entitled to commission upon all sales, not only of parts actually sold by it but also those sold by defendant during the life of the contract and in refusing to give the jury defendant's 4th request.

"(2) The court erred in not charging the jury as requested by defendant's 5th request that plaintiff was entitled to no commission except upon sales of automobile parts manufactured or machined by defendant.

"(3) The court erred in commenting unfavorably upon the testimony of accountants and upon referring to bookkeeping as an art rather than an exact science of mathematics.

"(4) The court erred in not charging the jury as requested by defendant's 3d request that plaintiff having proven no expense incurred by it on account of producing Type A motor was not entitled to recover any sum on that account.

"(5) The court erred in charging the jury upon the subject of fraud."

Groups 1 and 2 may be considered together. It is the contention of counsel that under the contract plaintiff was only entitled to commission upon the sales actually made by it and was not entitled to any commission upon sales made by defendant. That the "exclusive selling privileges" does not prohibit the defendant itself from selling its goods and does not entitle plaintiff to commissions on such sales. Counsel cite authorities which they think sustain their contention. An examination of them shows them easily distinguishable from the instant case. The pivotal question is, What does the contract mean when read in its entirety? Its language is not ambiguous. It in specific terms grants to the party of the second part the exclusive selling privileges of all parts manufactured and machined by the party of the first part, with one exception. There is nothing in the contract anywhere inconsistent with this grant. See *Whorley* v. *Exposition Co.* (Tenn. Ch. App.), 62 S. W. 346, and *Garfield* v. *Peerless Motor Car Co.*, 189 Mass. 395 (75 N. E. 695).

Was there reversible error in what the court said to the jury about the testimony of accountants in which he used the following language:

"I can simply say that it does seem strange, perhaps as strange to you as to me, that the persons who are versed and learned in the art of bookkeeping do not agree as to what the books actually show. Maybe that is the fact that has given rise to the statement that bookkeeping sometimes is an art, rather than an exact science of mathematics."

Counsel say:

"Is it any wonder that after the court had so clearly expressed his lack of confidence in the testimony, the jury concluded to follow his suggestion and, believing that plaintiff was entitled to a verdict for some amount, made no attempt whatever to reconcile the apparent

discrepancy and rendered a verdict for the full amount of the claim.

"We respectfully submit that there was no reason whatever for the court to so encroach upon the province of the jury and that his action in so doing is reversible error."

In this connection counsel for both sides call attention to a statement found at the foot of page 89 of the record, at the bottom of the certificate of the auditor of the plaintiff, reading:

"We agreed with the representatives of the Walker Company for present purposes as to all figures except those relating to the Ford and Trego companies."

This statement may suggest that what was said by the trial judge was unnecessary, but there is nothing in the record to indicate that what was said was harmful error.

4. Did the court err in not charging the jury that plaintiff had not proven any expense incurred on account of Type A motor, and therefore could not recover for that item?

There was testimony upon that subject as follows:

"I had a talk with Mr. Walker and Mr. Carey as to the disposition of that truck motor over in Cleveland. We told them that we could not use the motor, because we had no way to manufacture it, and we could not take it, and they of course were very willing to take it, because they were manufacturers and wanted it. Mr. Armstrong, Mr. Tobin and myself were all there at this meeting. Mr. H. J. Walker and Mr. Carey were there on behalf of the Walker Company. They said if we would turn over the original drawings, which were in our office at the time, the tracings, they would pay us for all the expenses that we had been put to, and take the motor themselves. On my return to Detroit, I forwarded a letter and invoice in accordance with our conversation. Exhibits 9 and 10 are the letter and the invoice to which I refer. It is a letter from the C. A. S. Engineering

Company, dated July the 28th, 1918, to the H. J. Walker Company, Cleveland, Attention of Mr. Carey.

"'*Gentlemen:* As per our meeting of yesterday, we herein enclose invoice covering the expense of this company on the Walker motor.

"'Yours very truly,

"'C. A. S. Engineering Company,

"'Per (I presume that that is Mr. C. D. Cutting.)'

"Now attached to that is an invoice Exhibit 10, C. A. S. Engineering Company, 790 Woodward avenue, Detroit, Michigan, dated August 7, 1918. Sold to the H. J. Walker Company at Cleveland, amount paid to Thomas & Thomas for services in connection with design, $4,212.19. I forwarded the tracings to the Walker Company. I have never ever had the motor or the tracings or anything in connection with it since."

We think there was testimony to go to the jury upon that question.

5. Did the court err in what he said to the jury upon the subject of fraud? Counsel complain of the following:

"If, however, you find, through false representations or fraud that plaintiff was induced—and that is the claim here—to change from five to two per cent., then, of course, that fraud could not be permitted to work any injury to the plaintiffs, and five per cent. would be the proper amount under the contract.

"In that connection I charge and instruct you as a matter of law, that the rule where fraud is charged is a different rule from the rule that I shall give you with regard to the burden of proof. Where fraud is charged there should be strong, positive proof of fraud before a jury is justified in finding that fraud did actually bring about a change or such a change as is claimed here. I will speak to you more particularly on the burden of proof in a few moments."

Counsel say there was no question of fraud in the case. It was not only the claim of the defendant that plaintiff was not entitled to any commission on the

Ford contracts, but it was its further claim that in any event it was entitled to but two per cent. commission. Its claim was stated in a letter to the plaintiff under date of June 21, 1918, from defendant:

"Notwithstanding the fact that the business from the Ford Motor Company is entirely due to the personal efforts of our Mr. H. J. Walker, we are planning on paying you a commission of 2% of the price per set, less the amount agreed upon to cover machinery, jigs, fixtures, and special equipment. This business was figured on the basis of a net profit of 15 per cent. and from present indications the actual profit will run considerably under this."

The plaintiff's version of that matter is as follows:

"When I was on the stand before you started to ask me about an interview between me and Mr. Walker about the amount of the Ford commission; I remember such a talk as that in your office in Detroit. At the time he stated to me that he did not believe that they would make 15 per cent. profit. And in view of that fact he asked me if we would accept 2 per cent. instead of 5 per cent. I told him that I would be very glad to do that, if they could show me that they did not make 15 per cent. * * * He said he would let it go until later on, which was done also. I said that I would let that matter of commission run a little further. I would take his word for it until they could show us what they had done. The price per crank case was $209.33 each from the Walker Company to the Ford Company for machining operations. There was $10 a piece, as I remember, from the figures to me at a later conversation. That is, those tools, jigs and fixtures. Deductions on each invoice.

"The Ford Company advanced the Walker Company $275,000 in order to make preparations to carry out this contract, and the price was to be placed on the machining operation so as to cover this $275,000 and would be paid back *pro rata* on each invoice for cases shipped, the amount as I remember was $10.08 a piece per crank case. The machining price of the case would have been $10.08 more, had the Ford Com-

pany not given them $275,000 to begin the operations with. Afterwards Mr. Walker did not furnish me with any figures, referring to the profit. I got those from Mr. Carey. Mr Carey wrote us a letter—Exhibit 8 is the letter. I went over there to talk with them and I told them that I was going to reinstate the charge of 5 per cent. against the contract unless they could show me that they had made less than 15 per cent. I got the actual figures on the pistons at the time. They were furnishing pistons to the Ford Motor Company as well as crank cases. It was all in one contract. We received, as I remember, we had two prices on pistons. There was a little difference in the airplane and the other type of piston. One was 75 and the other was 85. The actual labor cost in going over their records at the plant was 22 cents each. That was what we did. I saw their cost cards. I think that part should be in evidence. Mr. Carey told me that their labor, piece work, was 22 cents each, for each piston, in their plant. They were entitled to the scrap coming off each piston, which netted the Walker Company 15½ cents each, making a total cost of machining operations to the Walker Company of 6½ cents each. Their overhead, which covered oils, all overhead, freight, express charges, superintendence, foreman, was figured at 200 per cent. on top of this 6½ cents, making a net cost of pistons to the Walker Company of approximately 18½ cents, for which they received 75 cents each, or over 300 per cent. The crank cases, as I say, we didn't go into, only to the effect that Mr. Carey told me that they were making upwards of 25 per cent. on them. It was after that that we reinstated the charge of 5 per cent."

If any one has a basis of complaint because of what the trial judge said upon the subject of fraud, it is not the defendant. The amount involved in this litigation is large, but the questions involved are not complicated. The case was carefully and fairly tried.

The judgment is affirmed, with costs to the plaintiff.

STEERE, C. J., and WIEST, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.